IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| In the Matter of the Personal Restraint of | No. 86239-1-I |
| DAVID JAMES EIMER, | DIVISION ONE |
| Petitioner. | UNPUBLISHED OPINION |

HAZELRIGG, C.J. — David Eimer challenges the substance and imposition of community custody conditions by the Indeterminate Sentence Review Board (ISRB) in this personal restraint petition. He argues that certain conditions either exceed the ISRB's statutory authority or are unconstitutional or both. Because some of the challenged conditions are not sufficiently narrowly tailored to meet constitutional standards, we grant Eimer's petition in part and deny it in part.

FACTS

Eimer was charged with one count of rape in the second degree by forcible compulsion in April 2013 and found guilty following a jury trial in May 2015. The crime of conviction required an indeterminate sentence of 119 months up to a maximum term of life in prison. The judgment and sentence (J&S) ordered that Eimer would be subject to lifetime community custody if released from total confinement. The J&S further required Eimer to register as a sex offender and, in appendices, set out several community custody conditions to be imposed upon his release. In August 2020, Eimer began the Sex Offender Treatment & Assessment

Programs (SOTAP) offered by the Department of Corrections (DOC) and completed the program in August 2021.

Also in August 2021, the End of Sentence Review Committee determined that Eimer had a "[h]igh risk" of recidivism and recommended a variety of additional conditions "to mitigate his risk of sexual re-offense" if the ISRB found him releasable to community custody. The ISRB held a releasability hearing in October 2021 during which it considered Eimer's ISRB file and heard testimony from DOC Classification Counselor Marie McGuffin and SOTAP Specialist Naomi Smith. The ISRB considered "the totality of the evidence and information provided" and found "by a preponderance of the evidence that Mr. Eimer is less likely than not to commit a sex offense if released on conditions" and was thus releasable. The ISRB followed this with an order of release and supervision conditions in December 2021. The December 2021 release order imposed further community custody conditions. Eimer eventually challenged eight conditions set out in the order of release and supervision conditions.[1] These included prohibitions on going to establishments where the primary beverage served is alcohol, possessing Internet capable devices without additional conditions and monitoring programs, possessing or accessing sexually explicit materials, engaging in romantic or dating or sexual relationships without CCO preapproval and certain disclosures, contact with minors without the supervision of adults who know about his conviction and have been approved by the treatment provider, spending the night in homes where

---

[1] Eimer also challenged conditions C & E but withdrew those claims upon consultation with counsel.

children reside, and dating or forming relationships with people who have minor children without CCO approval and disclosure.

Eimer was released onto community custody in February 2022. Upon release, Eimer completed the mandated DOC social media and electronic device monitoring agreement and ISRB electronic device inventory and Internet search requirement, which built on condition M to impose more specific restrictions on Eimer's use of the Internet. Eimer obtained full-time employment and routinely tested negative for drugs and alcohol. However, Eimer's polygraphs often suggested deception, especially when asked about alcohol use and sexual contact with a specific woman, Aryn Amor. In April 2023, Eimer and Amor both requested community corrections officer (CCO) approval to begin a relationship as Amor was also under DOC supervision. This initial request was denied by CCO Mary J. Bullard who was then supervising both Eimer and Amor.

By December 2023, Eimer's supervision had been transferred to CCO Jordan James. When James asked Eimer what he had done for Thanksgiving, Eimer reported that he had attended a family gathering where his biological son and a minor child of his aunt were present.[2] James reminded Eimer that this was a violation of his community custody conditions. James would later state in the notice of violation that Eimer claimed that "he wasn't aware of this condition." James instructed Eimer to report back "to address the violation." Later, under further questioning by James, Eimer admitted that he had been in contact with his

---

[2] Eimer does not have custody of his biological son, and the child has been adopted by Eimer's aunt, who explained in a declaration prepared for this case that she wishes for Eimer to have a relationship with his child.

son "approximately 5 times since being released from prison." James examined the contents of Eimer's phone and found several pictures including the following: Amor, Eimer, and his son having lunch; Eimer and his son at a hockey game; and a picture of Eimer and several others in front of a pub in west Seattle and inside what James presumed was the same pub. James' further investigation of the phone revealed open Internet browser tabs with sexually explicit content and sexually explicit content saved to Eimer's Google Drive.[3]

Based on these discoveries, James expanded the search to include Eimer's vehicle and apartment. James spoke to Amor while searching Eimer's apartment, and she explained that she had "been staying at Mr. Eimer's one bedroom apartment for an unspecified amount of time." Amor denied knowledge of any violations and further denied that they were in a romantic relationship but did admit they had kissed. Eimer also admitted to this. James suspended Eimer's community custody as a result of the investigation and ordered him back into confinement until the ISRB could conduct a hearing. Eimer requested appointed counsel for the hearing, which was granted. DOC alleged the following four violations based on James' investigation: violation 1, "[c]ontact with prohibited person, minor child"; violation 2, "[e]ntering into a prohibited location, Admiral Pub"; violation 3, "[p]ossessing, accessing, and/or viewing sexually explicit material that displays nudity for sexual gratification"; and violation 4, "[e]ngaging in a romantic relationship without [DOC] approval."

---

[3] Google Drive is an Internet-based storage service that allows users to upload their own files.

The ISRB held a hearing on the alleged violations in January 2024. Eimer and DOC were represented by counsel. Only three of the violations were heard as the ISRB determined there was no probable cause for violation 1. Eimer pleaded guilty to violation 2 and guilty with explanation for violations 3 and 4.

Eimer's relationship with Amor was addressed first; both had previously sought approval for the relationship from Bullard, made the required disclosures to one another, and submitted letters stating their joint request. James stated that if Eimer were to be released and SOTAP providers assented the relationship "would likely get approved." As to violation 2, Eimer admitted that he had gone to the pub and knew he "shouldn't have been there" but explained that he was there for a "celebratory event" and did not drink any alcohol. Eimer confirmed he had attended Alcoholics Anonymous meetings for one year after release as required. Eimer claimed ignorance as to the sexually explicit materials found on his phone with regard to violation 3. He asserted that the webpages were the result of pop-ups and professed unfamiliarity with Google Drive, such that he was unsure how "it was saved to [his] phone." Eimer stated that he had installed the DOC-mandated monitoring software on his phone. Eimer was found guilty of violations 2, 3, and 4 but was released back to community custody.

Eimer filed his initial personal restraint petition (PRP) on January 25, 2024, challenging the conditions set out herein. On June 12, the acting chief of this court appointed counsel, referred the petition to a panel, and authorized supplemental briefing.

ANALYSIS

I.      ISRB Statutory Authority

Eimer asserts that this court should analyze the authority of the ISRB to impose community custody conditions under the standard articulated in our Supreme Court's opinion, *In re Personal Restraint of Ansell*.  1 Wn.3d 882, 533 P.3d 875 (2023).  He argues that the version of the authorizing statute considered in *Ansell* is the one that should control the review of his own conditions.  The ISRB disagrees and avers that its authority to impose conditions should be considered under the most recent iteration of the statute.

"A person subject to such community custody conditions may raise a challenge to the conditions through a PRP, where they must show that they are restrained and that the restraint is unlawful."  *Ansell*, 1 Wn.3d at 892 (citing RAP 16.4(a)-(c)).  A petitioner released onto community custody is still under the jurisdiction of the ISRB and restrained for purposes of the RAPs.  *Id*.  We review community custody conditions for an abuse of discretion, but the authority of the ISRB to impose those conditions is reviewed de novo.  *In re Pers. Restraint of Winton*, 196 Wn.2d 270, 274, 474 P.3d 532 (2020).

A.      Legislative History, Amendments, and Judicial Interpretation

A brief review of the development of Washington's statutory scheme for the imposition and enforcement of community custody is warranted.  The legislature passed RCW 9.94A.713 in 2001, and it governed the imposition of conditions by DOC until its repeal in 2009.  *See* LAWS OF 2001, 2d Spec. Sess., ch. 12, § 304;

LAWS OF 2008, ch. 231, § 57. Under that statute, a supervisee could seek an administrative hearing to challenge an imposed condition, and the hearing examiner was required to remove any conditions that were not "reasonably related to any of the following: (a) The crime of conviction; (b) The offender's risk of reoffending; or (c) The safety of the community." Former RCW 9.94A.713(5) (2001). The legislature replaced section .713 when it revised and recodified the grant of authority as RCW 9.94A.704 in the 2008 session. *See* LAWS OF 2008, ch. 231, § 10. RCW 9.94A.704 has subsequently been amended several times, and the current version now states in subsection (10)(b) that

> [r]egardless of the offender's date of sentencing, additional conditions imposed or modified by the [ISRB] may be based upon the offender's crime of conviction, risk of reoffense, or risk to community safety. The additional conditions of community custody need not be crime-related if the conditions reasonably relate to either the risk of reoffense or risk to community safety.

Further, a supervisee's challenge will fail if the condition "is reasonably related to at least one of the following: (i) The crime of conviction; (ii) The offender's risk of reoffending; (iii) The safety of the community; or (iv) The offender's risk of domestic violence reoffense." RCW 9.94A.704(10)(c).

"The law in effect at the time a criminal offense is committed controls the disposition of the case." *State v. Putman*, 21 Wn. App. 2d 36, 52, 504 P.3d 868 (2022). Eimer was charged in 2013, so the conditions set out in the J&S were imposed pursuant to the version of RCW 9.94A.704 then in effect. At that time, it required that conditions must be "reasonably related to any of the following: (i) The crime of conviction; (ii) The offender's risk of reoffending; (iii) The safety of the community." Former RCW 9.94A.704(10)(c) (2012).

Eimer contends that this aspect of his petition should be guided by the interpretation of the statute that predated RCW 9.94A.704 as set out in *Ansell*. There, our Supreme Court interpreted former RCW 9.94A.713(5) (2001) as requiring the community custody conditions to meet all three of the requirements contained in the version of RCW 9.94A.704 Eimer contends applies here. *See Ansell,* 1 Wn.3d at 903. The ISRB made the same argument in *Ansell* that it makes here, and the Supreme Court plainly rejected it, holding,

> The ISRB contends that RCW 9.94A.704 clearly outlines its authority to set community custody conditions, but that is not quite an accurate characterization of the law. Ansell committed these crimes between 2006 and 2008, so his sentence is governed by the version of the law in effect at that time: former RCW 9.94A.713(5) (2001) (Laws of 2001, 2d Spec. Sess., ch. 12, § 304). RCW 9.94A.345; *State v. Medina*, 180 Wn.2d 282, 287, 324 P.3d 682 (2014). Since then, the statute has been recodified as RCW 9.94A.704. Laws of 2008, ch. 231, §§ 57-59; Laws of 2009, ch. 28, § 12.

*Id.* at 900.

Here, as it averred in *Ansell*, the ISRB would have us apply the current version of RCW 9.94A.704, which confers broader authority, to Eimer's case despite the fact that he was sentenced nearly a decade before that statute became effective.

At oral argument before this court, the ISRB acknowledged the general rule in *Ansell* but argued that "the legislature has the authority to react to decisions by the Washington Supreme Court construing statutes and disagree on the policy level . . . this is simply what the legislature did here."[4] It further emphasized that

---

[4] Wash. Ct. of Appeal oral arg., *In re Pers. Restraint of Eimer,* No. 86239-1-I (July 22, 2025), at 9 min, 45 sec., *video recording by* TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2025071124/.

the legislature has "authority to enact laws retroactively unless, obviously, it violates the ex post facto clause, which it does not here."[5] Eimer stresses that if the ISRB were to reimplement his conditions under the revised statute "it could do so only to the extent modifications did not increase the quantum of punishment permissible for his conviction, in violation of ex post facto clause protections."

B.    Expanded Authority and Ex Post Facto Protections

The United States and Washington Constitutions both expressly prohibit the passage of ex post facto laws. U.S. CONST. art. I, § 10; WASH. CONST. art. I, § 23. "The ex post facto clause prohibits a State from enacting a law that retroactively increases the punishment for a crime after it was committed." *In re Pers. Restraint of Alston*, 7 Wn. App. 2d 462, 466, 434 P.3d 1066 (2019) (citing *Collins v. Youngblood,* 497 U.S. 37, 43 (1990)). "'Retroactive changes in laws governing the parole of prisoners, in some instances may be violative of this precept.'" *Id.* (quoting *Garner v. Jones*, 529 U.S. 244, 250 (2000)). "The 'controlling inquiry' is 'whether retroactive application of the change in . . . law created a 'sufficient risk of increasing the measure of punishment attached to the covered crimes.'" *Id.* (alteration in original) (internal quotation marks omitted) (quoting *Garner*, 529 U.S. at 250). "'A law that imposes punishment for an act that was not punishable when committed or increases the quantum of punishment violates the ex post facto prohibition.'" *In re Pers. Restraint of Flint*, 174 Wn.2d 539, 545, 277 P.3d 657 (2012) (quoting *In re Pers. Restraint of Hinton*, 152 Wn.2d 853, 861, 100 P.3d 801 (2004)).

---

[5] *Id.* at 12 min., 8 sec.

If the ISRB chose to reimpose or modify conditions based on its expanded authority under the current version of RCW 9.94A.704, the operative inquiry is whether such action would increase the quantum of punishment Eimer faces. Eimer contends that it would because "the conditions constitute punishment, but also because . . . their imposition creates exponentially more opportunities for arrest and sanction predicated on the supervisee's perceived 'violations.'" The ISRB disagrees and asserts that the 2024 amendment of the relevant statute was intended to reduce recidivism and promote community safety which are "generally regarded as non-punitive" objectives. The ISRB seems to contend that the pursuit of these legislative goals cannot amount to punitive action. However, this does not follow because the actions that the ISRB would potentially undertake as the *actual implementation* of these aims could still result in increased punishment of a supervisee as Eimer suggests. Critically though, without the ability to assess any specific modifications and attendant implications for Eimer's community custody, his ex post facto arguments amount to a preenforcement challenge that is not yet ripe.

"A preenforcement challenge to community custody conditions is ripe for review when 'the issues raised are primarily legal, do not require further factual development, and the challenged action is final.'" *State v. Nelson*, 4 Wn.3d 482, 494, 565 P.3d 906 (2025) (internal quotation marks omitted) (quoting *State v. Cates,* 183 Wn.2d 531, 534, 354 P.3d 832 (2015)). Eimer fails to meet these threshold requirements, insofar as his arguments concern the *potential* for the ISRB to impose conditions pursuant to the amended statute. The ISRB's

modification of condition N upon his release back onto community custody illustrates how the initial ripeness inquiry operates with regard to preenforcement challenges.

The only challenged condition of Eimer's that seems to have been revised is N, which was modified in January 2024 following his release back onto community custody that same month after serving time for the earlier violations. The legislative amendments to RCW 9.94A.704 at issue here became effective in March 2024. *See* LAWS OF 2024, ch. 118, § 1. However, the only change to the language of condition N was the removal of "romantic" in the description of certain types of relationships that require CCO approval and elimination of the requirement to disclose information about "unadjudicated victims." The original condition N read as follows:

> You must not engage in a *romantic or dating or sexual relationship* without your CCO's prior permission. You must disclose your status as a sex offender and the nature of your offending *to include unadjudicated victims,* to anyone with whom you intend to begin such a relationship. The disclosure must be verified by the CCO.

(Emphasis added.) The revised condition N imposed in April 2024 states,

> You must not engage in *a dating or sexual relationship* without your field case manager's prior approval. You must disclose your status as a sex offender and the nature of your offending to anyone with whom you intend to begin such a relationship. The disclosure must be verified by your field case manager.

(Emphasis added.) This is undisputably a modification of the terms of Eimer's community custody, but it does little, in a practical sense, to change the terms of the condition previously imposed other than to *reduce* the required disclosures. Further, it does not increase the punishment as Eimer was already required to

obtain permission for relationships and disclose his status. This is a final decision of the ISRB and does not require further factual development for us to reach our conclusion about the characterization of the change. While we can envision myriad other modifications that could be imposed pursuant to the expanded authority of the revised statute that may have the effect of increasing Eimer's risk of punishment, the speculative nature of such an exercise only emphasizes the value of the threshold analysis for preenforcement challenges. As such, we decline to consider Eimer's argument about potential future modification of the remaining conditions and, pursuant to the plain holding of *Ansell*, review the current conditions under the 2012 version of RCW 9.94A.704.

II.      Community Custody Conditions

Again, Eimer withdrew his disputes with conditions C and E after consultation with counsel and pursues only his challenges to conditions I, L, M, N, O, P, Q, and R. Having established the proper statutory framework in Part I, *supra*, we consider each in turn.

A.      Condition M

Eimer opposes the imposition of Internet monitoring by the ISRB, set out in condition M, despite its concession that the Internet did not play a role in his underlying offense. Eimer's constitutional challenge includes assertions that the terms of the DOC monitoring agreement and ISRB inventory and search requirement that supplement condition M are unconstitutionally vague and

condition M itself violates his privacy protections under the state constitution and the First Amendment to the United States Constitution. Condition M states,

> You may not own/use/possess an Internet capable device without first meeting with your CCO and fully and accurately completing the "Social Media and Electronic Device Monitoring Agreement" DOC Form #11-080. You must install a monitoring program, at your own expense, and your CCO must be your designated accountability partner. The requirements and prohibitions on this completed form will remain in effect until removed or modified in writing, signed and dated by you and your CCO.

Condition M is supplemented by DOC's social media and electronic device monitoring agreement and the ISRB's electronic device inventory and Internet search requirement. Eimer specifically challenges certain conditions from the DOC monitoring agreement as unconstitutionally vague. The agreement authorizes Eimer to use web browsers, approved e-mail accounts, and the Internet for communication such as texting or instant messaging or phone calls, creating "web content" including making websites or using social media, and "file sharing." Eimer is also permitted to use computers at education facilities where he was enrolled and at his place of employment "for employment purposes only." However, the DOC Internet monitoring agreement expressly prohibits Eimer from "purchasing, playing, registering, or participating" online games without prior approval from DOC. Eimer is also not allowed to have others use the Internet on his behalf or to have them "access files or information" that are forbidden to him.

Eimer separately avers these restrictions are not reasonably related to the circumstances of his crime and violate his privacy rights under the state constitution, as well as the First and Fourteenth Amendments to the United States Constitution. The ISRB argues that such monitoring is necessary to ensure that

Eimer is in compliance with other community custody conditions, specifically the prohibition on possession of sexually explicit materials, even if the Internet did not play a role in his underlying offense.

The Washington State Constitution provides more stringent protection of our privacy than the federal constitution and expressly declares that "[n]o person shall be disturbed in [their] private affairs, or [their] home invaded, without authority of law." WASH. CONST. art. I, § 7. Typically, the required authority of law is a warrant. *State v. Cornwell*, 190 Wn.2d 296, 301, 412 P.3d 1256 (2018). The protection afforded by our state constitution to individuals on community custody is less than it provides to the general public. *Id.* CCOs may "search an individual based only on a 'well-founded or reasonable suspicion'" of a violation, a plain exception to the rule for the general public that requires "a warrant supported by probable cause." *Id.* at 302 (quoting *State v. Winterstein,* 167 Wn.2d 620, 628, 220 P.3d 1226 (2009)). Our courts have "specifically recognized the reduced privacy interests of sex offenders due to the threat they pose to public safety." *In re Det. of Lee*, 14 Wn. App. 2d 271, 294, 471 P.3d 915 (2020).

Restrictions on Internet access implicate the First and Fourteenth amendments. *State v. Frederick*, 20 Wn. App. 2d 890, 904, 506 P.3d 690 (2022). The United States Supreme Court has instructed that a state's restrictions on sex offenders' access to the Internet "must be 'narrowly tailored to serve a significant government interest,'" especially when that restriction has implications on the supervisee's ability to access social media. *Packingham v. North Carolina*, 582 U.S. 98, 105-08 (2017) (quoting *McCullen v. Coakley*, 573 U.S. 464, 486 (2014)).

- 14 -

"Although a condition of community custody may restrict a convicted defendant's access to the Internet, to avoid a First Amendment violation, the restriction must be *narrowly tailored to the dangers posed by the specific defendant*." *Id.* (emphasis added). "A condition of community custody is unconstitutionally vague if it either fails to give fair warning of what is forbidden or fails to give ascertainable standards that will prevent arbitrary enforcement*.*" *State v. Johnson,* 197 Wn.2d 740, 747, 487 P.3d 893 (2021). "'If persons of ordinary intelligence can understand what the [law] proscribes, notwithstanding some possible areas of disagreement, the [law] is sufficiently definite.'" *Id.* (alterations in original) (internal quotation marks omitted) (quoting *State v. Bahl*, 164 Wn.2d 739, 754, 193 P.3d 678 (2008)).

### 1.      Consideration of Conditions M and L as Interdependent

The terms of Eimer's indeterminate sentence require community custody for the rest of his life. As a person with a conviction for a sex offense, Eimer has a reduced expectation of privacy, but only to the extent required to monitor his compliance with the conditions imposed by the ISRB. The ISRB concedes that Eimer's crime of conviction did not involve the Internet and, thus, condition M cannot be justified as crime related. Instead, the ISRB defends condition M as a necessary tool to ensure compliance with the prohibition on possession of sexually explicit materials contained in condition L, which it asserts is separately justified under *State v. Nguyen*[6] and *Frederick*.

Our Supreme Court's recent opinion in *Nelson* provides a useful parallel because it also considered whether a condition unrelated to the crime could be

---

[6] 191 Wn.2d 671, 425 P.3d. 847 (2018).

- 15 -

justified as a method of enforcing another condition.  4 Wn.3d at 492.  Nelson was subject to community custody conditions that required him to "[s]ubmit to breathalyzer [(BA)] or any other testing to ensure no alcohol consumption" and to "[s]ubmit to urinalysis [(UA)] or other testing to ensure drug-free status."  *Id.* at 488. Nelson challenged these conditions as infringements on his right to privacy that were not crime related and averred that "even if the State ha[d] a compelling interest" in requiring BAs and UAs, the "testing conditions [were] not narrowly tailored."  *Id.* at 491, 507.  The court observed that the "undisputed purpose of the BA and UA testing conditions is to monitor Nelson's compliance with other conditions prohibiting him from using drug and alcohol."  *Id.* at 503.  The court held that the conditions were sufficiently tailored because,

> (1) the testing is limited in scope and only allowed to check for compliance, not as a fishing expedition, (2) the randomness makes the testing effective and prevents Nelson from circumventing the process, and (3) requiring reasonable suspicion could ultimately be *more* intrusive by incentivizing CCOs to closely monitor Nelson's behavior.

*Id.* at 509.

The parties here were questioned regarding the import of *Nelson* on Eimer's petition at oral argument in this court.  Eimer sought to distinguish the Internet monitoring by the ISRB from the BA and UA conditions at issue in *Nelson*.  He asserted that in his case the CCO is "passively receiving these alerts" from the monitoring software based on trigger words, and once there is an alert, the CCO has reasonable suspicion to conduct a more invasive search which erodes "the constitutional requirement" for a "a nexus between the suspicion and the search

and . . . narrow tailoring."[7] Eimer further contended that Internet monitoring could not be justified as a mechanism to enforce condition L in the same way as the conditions at issue in *Nelson* because UA and BA testing is limited to the particular substances they are designed to detect while, here, the ISRB is "monitoring everything" he does on the Internet.[8] In contrast, the ISRB stated that

> *Nelson* concluded that there doesn't have to be a direct nexus between the crime of conviction and the type of monitoring or testing that is proposed. Instead, there only has to be a reasonable nexus between the type of monitoring and the conditions that are imposed.[9]

Counsel for the ISRB specifically argued that conditions M and L were analogous to the paired conditions in *Nelson*.[10] The holding of *Nelson* expressly states that a condition may be properly imposed to ensure compliance with another, but we must still consider whether condition M is adequately tailored to enforce condition L.

### 2. Constitutionally Sufficient Tailoring

The parties here agree that our case law requires conditions imposed by the ISRB to be tailored both to general classes of offenders *and* to the circumstances of a given supervisee.[11] *See Johnson,* 197 Wn.2d at 746 (Internet monitoring via filter broadly upheld because of relation to circumstance of crime; reserved on issue of First Amendment concerns regarding filtering software); *Frederick,* 20 Wn. App. 2d at 905. Critically here, the ISRB does not apply the

---

[7] Wash Ct. of Appeals oral arg., *supra*, at 3 min., 37 sec.
[8] *Id.*, at 4 min., 35 sec.
[9] *Id.*, at 17 min., 26 sec.
[10] *Id.* at 17 min., 48 sec.
[11] *Id.* at 15 min., 13 sec. (ISRB); 19 min., 38 sec. (Eimer).

second step of that rule to Eimer's circumstances. Nowhere in its briefing on appeal or argument before this court does it acknowledge the conclusions in Eimer's SOTAP institutional transition summary or other factors specific to Eimer but, rather, relies on only his generic classification as a sex offender. *See State v. O'Cain,* 144 Wn. App. 772, 774-75, 184 P.3d 1262 (2008) (restriction on Internet use based solely on conviction for rape in the second degree stricken in absence of corresponding recommendation in sexual deviancy evaluation).

As evidence of proper tailoring, the ISRB notes that Eimer is allowed to use public computers without monitoring and play online games with the completion of a safety plan. This is not constitutionally sufficient tailoring to Eimer as a specific individual because, as his current CCO Hannah Charron-Wilde states, pursuant to "Policy 380.260, DOC does not install monitoring software on publicly accessible devices such as computers provided for work and education by third parties."[12] Rather this practice that applies to Eimer is a *standard policy* and not one tailored to his particular circumstances. Additionally, at oral argument in this court, the ISRB conceded that the provisions regarding e-mail, game consoles, and smart TVs were boilerplate but maintained that this form was "developed . . . to tailor and provide guidance to the supervising CCO when it comes to supervising, specifically, conditions related to sexually explicit material."[13] Again, this is only tailoring by class.

Charron-Wilde provided a declaration during the pendency of this PRP that described her "regular practices" when monitoring the Internet activity of

---

[12] The text of policy 380.260 was not provided to this court.
[13] *Id.* at 13 min., 15 sec.

supervisees. While she asserted that her "regular practice is to require only that the device not be set on the 'nothing' selection as this would prevent the program from sharing any information with [her],"[14] nowhere in the declaration does she explain how she has tailored her supervision of Eimer's Internet activity based on *his* crime of conviction or risk assessment. This is also plainly insufficient to establish that the constitutional standard for tailoring has been satisfied.

Again, the ISRB concedes that the Internet did not play a role in Eimer's crime, and this lack of causal link requires the ISRB both to consider Eimer's specific circumstances and ensure that its monitoring regime is attendant to them. *See Johnson,* 197 Wn.2d at 745. We recently considered the adequacy of tailoring of Internet monitoring by DOC as a means of supervising compliance with ISRB conditions in *In re Personal Restraint of Canter*, __ Wn. App. 2d __, 579 P.3d 1106 (2025).

Canter had used Craigslist, e-mail, and text messages to arrange a sexual encounter with a fictitious child. *Id*. at 1110. Upon his release, the ISRB imposed similar Internet monitoring conditions to those it implemented in Eimer's case. *Id.* Canter challenged the conditions and related monitoring requirements and specifically contended that the ISRB had failed to adequately tailor its monitoring to the circumstances of his offense. *Id.* at 1114. We held that constant suspicionless monitoring of Canter's Internet activities failed to satisfy the constitutional requirement for narrow tailoring because using a common method

_____

[14] Charron-Wilde's declaration explains that the monitoring software Accountable2You allows for different levels of tracking. "Accountable2You generates alerts based on 'trigger words' related to sexually explicit material." Eimer's CCO receives alerts if "Eimer engages in online activities Accountable2You has categorized as 'questionable' or 'highly questionable.'"

of communication in furtherance of the crime could not support such an ongoing, extensive invasion of his privacy. *Id.* at 1118. We concluded that if a CCO had reasonable suspicion that Canter was using the Internet to search for or contact potential victims, active investigation and intrusion would be justified. *Id.* However, monitoring every keystroke of every communication all the time, including those protected by health privacy laws or attorney-client privilege, simply because the supervisee used the Internet to facilitate the crime of conviction, was not a practice that was properly tailored to the supervisee and his particular circumstances. *Id.*

Here, the ISRB has again failed to adequately tailor its monitoring conditions and the connection to Eimer's crime of conviction is even more tenuous than that at issue in *Canter*. This flaw also suggests that condition M is not reasonably related to preventing reoffense because the method of monitoring is not specifically designed to prevent the patterns or behaviors that led to his offenses in the first place as identified in Eimer's August 2021 SOTAP institutional transition summary: "sexual preoccupation, impulsivity, and general social rejection/loneliness." Thus, condition M is not sufficiently crime related due to this lack of tailoring to Eimer as an individual. Condition M must be stricken as, under the plain requirements of both our state and federal constitutions, it is insufficiently tailored to the facts of Eimer's crime of conviction and his unique circumstances. Accordingly, we need not reach his vagueness challenge to this condition.

B. Condition I

Eimer avers that condition I "is not crime related" and does not mitigate his risk to reoffend. Condition I states, "You must stay out of establishments, such as

bars, taverns, casinos, and cocktail lounges, where alcohol is the primary beverage served." Eimer concedes that his crime of conviction involved alcohol use but notes that "he did not meet his victim" at an establishment where alcohol was the primary beverage served. He avers that condition D, which mandates that he cannot "use, possess, consume, or control alcohol," is adequate "to mitigate his risk to offend" resulting from alcohol use. The ISRB defends condition I on the ground that alcohol was involved in Eimer's crime, even though a business serving alcohol was not.

Beyond Eimer's admission that alcohol played a role in his offense, the record contains evidence that supports the inference that a condition prohibiting possession, alone, is inadequate to mitigate the risk that he could reoffend. The "Probable Cause/Admin Review Sheet" regarding his violation of this condition stated,

> Mr. Eimer's current violation is of concern being that Mr. Eimer's index offense is alcohol related, in that Mr. Eimer was heavily intoxicated when he committed his offense, as well as alcohol being used as a "weapon" against his victim. Mr. Eimer should not be around alcohol nor women who are intoxicated.

The decisions and reasons issued by the ISRB on November 2, 2021, following Eimer's October 6 releasability hearing, noted that Eimer had stated that "peer pressure and alcohol use were at the heart of his sexual offending. His co-defendant was older than him and initiated the sexual assault, he was a 'follower.'"

This evidence supports the proposition that an environment with the potential for heavy social drinking and where women may be intoxicated creates or contributes to a risk that Eimer will reoffend. If he is in such an establishment, there is risk that he will succumb to peer pressure to drink and slip back into the

"follower" role that he directly linked to his offense when discussing it at his releasability hearing. Eimer's failed polygraphs indicated that he had potentially possessed or consumed alcohol while on community custody, and the pub photos found on his phone further corroborate that Eimer may have engaged in social drinking while on community custody, despite the prohibition set out in condition D. Without more, a restriction focused exclusively on alcohol possession and consumption cannot address his particular risk of reoffense, which captures how alcohol affects Eimer's social environment and his attendant decision making, not just how alcohol affects Eimer in a physiological sense. We conclude that this condition is sufficiently crime related such that it is properly within the ISRB's authority.

C.     Condition L

Eimer next contends that condition L is not crime related and is unconstitutionally vague because it does not adequately define the prohibited material, which can lead to subjective enforcement. Condition L reads as follows:

> L. You must not possess or access sexually explicit materials. Sexually explicit materials consists of any item reasonably deemed to be intended for sexual gratification and which displays, portrays, depicts, or describes: a) Nudity, which includes, but is not limited to, exposed/visible (in whole or part, including under or through translucent/thin materials providing intimate physical detail) genitals/genitalia, anus, buttocks and/or female/transgender breast nipple(s); b) A sex act which includes, but is not limited to, genital-genital, oral-genital, anal-genital, or oral-anal contact/penetration, genital or anal contact/penetration with an inanimate object, masturbation and/or bodily contact/penetration, genital or anal contact/penetration with an inanimate object, masturbation and/or bodily excretory behavior; c) Sadistic/masochistic abuse, bondage, bestiality, and/or participant who appears to be non-consenting, dominated, degraded, humiliated, or in a submissive role, and/or a

participant who appears to be acting in a forceful, threatening, dominating, or violent manner; and/or d) A minor, or a model or cartoon depicting a minor, in a sexually suggestive setting/pose/attire.

The ISRB justifies this condition by asserting that "possession of sexually explicit material is reasonably related to every sex offense, regardless of whether the sex offender used sexually explicit material before or during the commission of the sex offense." It does not engage with Eimer's vagueness challenge.

The ISRB again relies on *Nguyen* and *Frederick* to support its position on this challenge, as both cases considered similar challenges to comparable community custody conditions. In *Nguyen*, our Supreme Court held the condition under review was sufficiently crime related, even though there was not a direct connection between sexually explicit materials and the conduct that constituted the crime because

> Nguyen committed sex crimes and, in doing so, established his inability to control his sexual urges. It is both logical and reasonable to conclude that a convicted person who cannot suppress sexual urges should be prohibited from accessing "sexually explicit materials," the only purpose of which is to invoke sexual stimulation.

191 Wn.2d at 686. The ISRB relies on this same passage to justify the challenged condition here as crime related. In *Frederick*, Division Three of this court relied on this language from *Nguyen* to reason that "the [ISRB] appears 'to believe that [sexually explicit] materials may trigger the defendant to reoffend or, perhaps, commit another sex crime.'" 20 Wn. App. 2d at 908 (some alteration in original) (quoting *Nguyen*, 191 Wn.2d at 685). We then concluded that the connection between the condition and offense was sufficient to hold that the condition was within the ISRB's discretion. *Id.*

In his reply brief, Eimer attempts to distinguish the facts of his crime of conviction from Nguyen's and points to differences in the age of and relationship to the victim, duration of the assaultive conduct (the abuse occurred over many years in Nguyen's case), and the role of alcohol in Eimer's offense. He also contends that the ISRB does not provide scientific evidence to prove its assertion regarding a connection between sex offenders and sexually explicit material, his completion of SOTAP establishes that he has learned to control his impulses, and his offense was a result of his intoxication and mental health problems, not sexually explicit materials. However, these arguments are not supported by citations to authority as required and do not demonstrate why imposing condition L is an abuse of the ISRB's discretion. Eimer misunderstands the review conducted by this court; the condition does not need to be supported by rigorous scientific inquiry but, rather, must simply be reasonably related to his crime. We follow *Nguyen* and *Frederick* and conclude that this condition is reasonably related to the crime and therefore within the ISRB's authority to impose.

Eimer relies on *Ansell* to support his vagueness challenge to condition L but offers the opinion from this court in that case, without addressing its subsequent reversal by our Supreme Court. *See* No. 82506-2-I (Wash. Ct. App. Jan. 18, 2022) (unpublished), https://www.courts.wa.gov/opinions/pdf/825062.pdf, *aff'd in part, rev'd in part,* 1 Wn.3d 882 (2023). In reversing the Division One opinion in *Ansell*, our Supreme Court held that a condition similar to the one Eimer now challenges was sufficiently definite to prevent arbitrary enforcement. 1 Wn.3d at 894. In the absence of authority to support Eimer's vagueness argument, we conclude that he

has failed to demonstrate entitlement to relief on this basis. *See State v. Barker,* 162 Wn. App. 858, 864, 256 P.3d 463 (2011); RAP 10.3(6).

D. Conditions O, P, Q, and R

Eimer avers that conditions O, P, Q, and R, all of which restrict him from having contact with minors, are impermissible because they are not crime related and violate his First Amendment right to free association, particularly as they relate to his son. He argues that these restrictions are also not reasonably related to community safety, because his only past offense that involved a minor occurred when he was a juvenile. In the alternative, Eimer requests modification of these conditions to allow contact with male minors as he believes he poses no risk to them.[15] The ISRB concedes that "Eimer's crime of conviction did not involve minors" but still contends that these prohibitions are justified because minors were involved in both his juvenile conviction and a later incident for which a jury acquitted him. It further asserts that "Eimer's criminal record establishes a reasonable relationship between the challenged conditions," each of which provides specific restrictions, and "Eimer's risk to community safety."

Condition O allows for contact so long as the minor is "accompanied by a responsible adult capable of protecting the child, who has knowledge of the conviction," and has been approved by Eimer's "CCO and/or . . . sexual deviancy treatment provider." Condition P prohibits Eimer from spending the night in a residence "where minor children live or are spending the night." Condition Q

---

[15] After oral argument in this court, Eimer filed a statement of additional authority in support of this request and the ISRB submitted a response to Eimer's additional authority, both of which were considered by the panel.

disallows relationships with people who have minor children without preapproval from his CCO. Condition R requires Eimer to disclose his offender status to people with whom he pursues a relationship if they have minor children and CCO approval of the relationship.

According to a probable cause (PC) affidavit filed in Benton County Superior Court and an assessment prepared in 2006 to determine if Eimer was amenable to a special sex offender disposition alternative (SSODA), Eimer was charged with child molestation in the first degree in 2005 based on an incident with his nine-year-old cousin that occurred during the summer of 2004 when Eimer was 13 years old. The PC affidavit stated that the victim's mother reported that "she found the victim with her legs in up the air and [Eimer] with his hand under the victim's underwear. Upon questioning the victim, the victim told her mother that [Eimer] had penetrated her vagina with his finger." Eimer pleaded guilty and, while the court initially ordered the SSODA, it revoked the sentencing alternative in 2007 based on Eimer's noncompliance. Eimer was again charged with child molestation in the first degree in 2009 when he was 19. The PC affidavit in that case noted that the child, aged 11, told an interviewer that Eimer has placed what she "believed to be his penis" on her feet, "although she did not look." She also reported that Eimer had "put his thing between her legs" and had "put his hand under her bra on her side." The jury in that case acquitted Eimer in 2011.

The ISRB primarily relies on *In re Personal Restraint of Golden* to defend these conditions as crime related. 172 Wn. App. 426, 290 P.3d 168 (2012). Golden had been released to community custody following incarceration for

robbery in the second degree and also had prior convictions for rape in the second degree and unlawful imprisonment. *Id.* at 428-29. He challenged a condition prohibiting contact with minors and DOC defended it on the basis that Golden had "a series of uncharged and unpunished offenses against minors revealed by his risk assessment." *Id.* at 436. However, Golden argued that the condition "constitute[d] additional punishment" for his earlier convictions, in violation of the constitutional prohibition against double jeopardy. *Id.* Division Three of this court noted that double jeopardy was not implicated because the condition was not based on Golden's prior conviction against an adult, but the "series of uncharged and unpunished offenses against minors revealed in his risk assessment." *Id.* *Golden* simply does not hold that uncharged offenses justified the condition in the first place.

Our courts have been "reluctant" to uphold conditions that prohibit contact with "classes of persons different from the victim of the crime." *State v. Warren*, 165 Wn.2d 17, 33, 195 P.3d 940 (2008).

> It would be logical for a sex offender who victimizes a child to be prohibited from contact with that child, as well as from contact with other children. It is not reasonable, though, to order even a sex offender not to have contact with a class of individuals who share no relationship to the offender's crime.

*State v. Riles,* 135 Wn.2d 326, 350, 957 P.3d 655 (1998), *abrogated on other grounds by State v. Valencia*, 135 Wn.2d 782, 239 P.3d 1059 (2010). However, a supervisee's "'freedom of association may be restricted if reasonably necessary to accomplish the essential needs of the state and public order.'" *State v. Riley,* 121

Wn.2d 22, 37-38, 242 P.3d 52 (1993) (quoting *Malone v. United States*, 502 F.2d 554, 556 (9th Cir. 1974)).

The ISRB provides Eimer's past juvenile offense and 2011 acquittal only to support imposing conditions O, P, Q, and R. The cases that have considered restrictions on contact with minors based on sex offenses, whether or not they involved children, provide a comparative spectrum. Where the victim of the crime of conviction was a child, the circumstances of the crime relate directly to the restriction and the condition is justified. *See State v. Williams,* 157 Wn. App. 689, 692, 239 P.3d 600 (2010). On the other end, in cases where the victim was not a minor, the circumstances of the crime no longer relate to the imposed condition, and it is no longer justified. *See Riles,* 135 Wn.2d at 349-50.[16] Eimer's circumstances fall between these two outcomes.

Regarding Eimer's 2006 juvenile conviction and the later offense that resulted in acquittal in 2011, his 2021 SOTAP institutional transition summary observed that "[i]n both instances his sexual preoccupation, impulsivity, and general social rejection/loneliness appeared to be the driving [dynamic risk factors], less so that [sic] true arousal to deviant themes or stimuli." It further noted that "[Eimer] does not appear to have developed deviant arousal patterns" and, instead, ascribed his behavior to the previously noted risk factors. This does not

---

[16] *Riles* consolidated two appeals that challenged the imposition of conditions prohibiting contact with minor children. 135 Wn.2d at 331-32. Riles was convicted of a sex offense against a minor. *Id.* at 332. Gholston, the other appellant, was convicted of a sex offense against an adult victim. *Id.* The Supreme Court held that because Riles "was convicted of anally raping a six-year-old boy," the condition prohibiting "contact with minor-age children" was a "reasonable restriction imposed upon him for the protection of the public—especially children." *Id.* at 347. In contrast, the court concluded that "the provision is not justified under the facts in Petitioner Gholston's case" because there was "no showing that children are at risk and thus require protection from him." *Id.* at 350.

show that Eimer is inappropriately drawn to children such that his contact with them would put children at risk, instead DOC's own SOTAP treatment providers have found that other factors were his drivers to offend. Conditions O, P, Q, and R do not address these factors, so are not sufficiently crime related. Nor has the ISRB established that conditions O, P, Q, and R are necessary for community safety as it has not demonstrated that Eimer is a current risk to children broadly, let alone his son.

To support his First Amendment challenge, Eimer primarily relies on *Winton* and *Riles*. He correctly contends that *Winton* establishes "'[l]imitations upon fundamental rights are permissible' for the duration of the offender's sentence where restrictions are 'imposed sensitively . . . [and are] reasonably necessary to accomplish the needs of the state and public order.'" 196 Wn.2d at 277 (alterations in original) (internal quotation marks omitted) (quoting *Riley,* 121 Wn.2d at 37-38). *Riles* also considered a freedom of association challenge to an order preventing the supervisee from having contact with minors. 135 Wn.2d at 346. However, while *Riles* acknowledged the same constitutional concerns Eimer presents here, the restriction was upheld in that case. *Id.* at 347.

Eimer's primary concern appears to be whether he is allowed contact with his biological son. He does not have custody of his son, who has been adopted by a family member. Eimer does not present a challenge premised on the right to parent but does urge the court to nonetheless consider that relationship. Toward that end, he notes that the adoptive relative provided a declaration that states their desire to "support [Eimer] in his efforts to maintain contact with [his son]." His

- 29 -

concern is that his ability to maintain a healthy relationship with his son will be hampered by these conditions. The record also shows that the adoptive relatives worked with Eimer to take formal steps to ensure that Eimer could remain in contact with his biological son.

Conditions that burden the fundamental right to parent must also be "'sensitively imposed' so that they are 'reasonably necessary to accomplish the essential needs of the State and public order.'" *In re Pers. Restraint of Rainey*, 168 Wn.2d 367, 377, 229 P.3d 686 (2010) (quoting *Warren*, 165 Wn.2d at 32). Even though Eimer no longer has the right to parent this child due to the adoption, restrictions on his freedom of association must still be "'imposed sensitively'" and be "'reasonably necessary to accomplish the essential needs of the state and public order.'" *Winton,* 196 Wn.2d at 277 (internal quotation marks omitted) (quoting *Riley,* 121 Wn.2d at 37-38). Additionally, the State has a "compelling interest in preventing harm and protecting children." *State v. Corbett,* 158 Wn. App. 576, 598, 242 P.3d 52 (2010). Thus, the analysis for a challenge based on the right to parent and one premised on the freedom of association are functionally identical.

The ISRB fails to show that the conditions preventing Eimer from having contact with minors are essential for the needs of the state and public order or community safety and the protection of children.[17] Again, the conditions fail to

---

[17] In response to additional authority Eimer provided to this panel after oral argument, the ISRB offered additional justification for these conditions. It contended that even though "Eimer was acquitted of the adult offense against a minor, experts in the field of sexual reoffense prediction count an acquittal as a risk-elevating 'charge,'" and the condition could be justified on that basis. However, this contention still fails to provide *specific* facts that show Eimer is a danger to children.

engage with Eimer's specific risk factors which do not indicate that he is a current danger to children. The ISRB does not explain why these conditions are necessary beyond its general references to Eimer's juvenile conviction and acquittal after jury trial; it does not provide a meaningful link between Eimer's past offense and the risks it ascribes to him. In light of Eimer's current risk assessment as set out in the 2021 SOTAP institutional transition summary, which does not identify any risk to children, these past events alone cannot support the imposition of conditions O, P, Q, and R, particularly as the ISRB does not otherwise develop a connection on which they could be justified.

Because these conditions are not crime related or necessary for community safety and unduly restrict Eimer's freedom of association, they must be stricken.

### E. Condition N

Finally, Eimer asserts that condition N is unconstitutionally vague and violates due process. Relying on *State v. Padilla*, 190 Wn.2d 672, 677-79, 416 P.3d 712 (2018), Eimer notes that "a condition is vague, in violation of due process, if it vests the supervising officer with unfettered discretion." The ISRB defends this condition as both crime related and sufficiently definite to be constitutional. It asserts that "the facts of Eimer's crime make it very obvious what the standard for approving Eimer's dating and sexual relationships is—whether they will put Eimer's partner at risk of sexual assault." This position is premised on the statements by Jeff Patnode of the ISRB who presided over the January 11, 2024, violation hearing and outlined the risks considered by a CCO before approving a supervisee's relationship. There, he explained,

> Generally speaking, you know, if there's not an ISRB approval element to the condition—obviously, it's the DOC's decision—but it's usually based off if there's some kind of risk. Is that person a risk? Is that person a drug user that puts our person in risk of using drugs? Do they have minor children? Are they vulnerable? You know, something that would be risk-related is what I typically would expect would be a reason for denying the relationship.

At the hearing, Eimer's CCO at the time, James, stated that he would seek the approval of Amor's CCO and the SOTAP providers before approving Eimer to proceed with an intimate relationship.

When considering a vagueness challenge to a condition of community custody, we will reverse the imposition only if it is manifestly unreasonable. *Winton*, 196 Wn.2d at 277. An unconstitutional condition is manifestly unreasonable. *Id.* This aspect of a vagueness challenge requires "benchmarks guiding enforcement of the condition," otherwise there is a risk for potentially arbitrary enforcement. *State v. Shreve,* 28 Wn. App. 2d 785, 793, 538 P.3d 958 (2023). Our state courts have routinely upheld similar conditions facing vagueness challenges, but most of these focused on the language of the condition defining "romantic or dating or sexual relationship." *See, e.g., Nguyen,* 191 Wn.2d at 681-83; *Frederick,* 20 Wn. App. 2d at 908-13; *State v. Peters,* 10 Wn. App. 2d 574, 590-92, 455 Wn. App. 2d 141 (2019). These cases are nonetheless instructive here. For example, in *Nguyen*, our Supreme Court explicitly held that

> a convicted person is not entitled to complete certainty as to the exact point at which [their] actions would be classified as prohibited conduct. Instead, all that is required is that the proscribed conduct is sufficiently definite in the eyes of an ordinary person.

191 Wn.2d at 681 (citation omitted). Toward that end, we consider whether "the context of the judgment and sentence, and related documents" to which future

CCOs will refer "provide sufficient benchmarks to prevent arbitrary enforcement." *Johnson,* 197 Wn.2d at 748.

An assessment of the risk is necessarily subjective, but it does not follow that condition N is so unconstitutionally vague as to lead to arbitrary enforcement. The procedure as described by Patnode at the violation hearing is sufficiently definite because it considers specific risk factors that can be commonly understood. Patnode made clear that CCOs will primarily consider if Eimer will put the potential partner or others in danger if the relationship is allowed. So long as the ISRB has a recognizable standard that it applies to determine whether a relationship will be approved, condition N is not unconstitutionally vague. Thus, we decline to strike condition N.

We grant the petition in part as to conditions M, O, P, Q, and R and deny in part as to conditions I, L, and N.

WE CONCUR: